IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF GEORGIA
ATLANTA DIVISION

| | |
|---|---|
| UNITED STATES OF AMERICA | CRIMINAL ACTION FILE NO. |
| v. | |
| DAYNA JOY LIVERMAN | 1:15-CR-284-AT-JKL-5 |

## FINAL REPORT AND RECOMMENDATION

On July 12, 2016, a federal grand jury in the Northern District of Georgia returned a fifteen count superseding indictment against six defendants arising out of a series of alleged home invasions and kidnappings in Atlanta, Georgia. [*See* Doc. 134.] Defendant Dayna Joy Liverman, one of those defendants, is charged with a single count of Hobbs Act Robbery in violation of 18 U.S.C. §§ 1951(a) and 2. [*Id.* at 2-3 (Count Five).]

Pending before the Court is Liverman's Motion to Suppress Statements [Doc. 300], in which she seeks to suppress statements that she made to FBI agents following her arrest in Southfield, Michigan, on July 29, 2016. On August 30, 2017, I held an evidentiary hearing on this motion. [Doc. 334 (hearing); Doc. 336 (transcript).] Following the evidentiary hearing, the government filed a brief in opposition to the motion [Doc. 339], and Liverman filed a reply in support [Doc.

340].  The deadline for the government to file an additional reply brief has passed. The motion is therefore ripe for consideration and for the reasons that follow, I **RECOMMEND** that Liverman's motion be **DENIED**.

## I.     FACTS

Liverman was arrested on the morning of July 29, 2016, in Southfield, Michigan, where she was living at the time.  [Doc. 336 at 19-20.]  Prior to her arrest, the FBI advised the Southfield, Michigan, police department that there was an outstanding federal warrant for her arrest.  [*Id.* at 11, 19.]  On the morning of July 29, 2016, an FBI task force officer who lived across the street from Liverman's residence reported that he saw Liverman at the residence, and the FBI forwarded that information to the Southfield police department, advising them that the FBI "were looking to pick her up."  [*Id.* at 11.]  Later that morning, Southfield police officers arrested Liverman during a traffic stop and transported her to the Southfield police station.  [*Id.* at 4-5.]  It is unclear whether Southfield police stopped her for a separate traffic violation, or simply on the basis of the federal arrest warrant.  [*See id.* at 11, 25-26.]  Nonetheless, during the course of the traffic stop, the police informed her that they had a warrant for her arrest out of Atlanta.  [*Id.* at 26.]

Later that day, FBI Special Agents Zane Nevala and Chris Pennisi arrived at the Southfield police station to take custody of Liverman and transport her to the

2

Federal Courthouse in Detroit.  [Doc. 336 at 3-5.]  Liverman was brought to them from her holding cell, and the two agents walked Liverman out the front of the station and onto the curb.  [*Id.* at 6.]  SA Pennisi left to get the agents' car, while SA Nevala and Liverman stood alone in front of the building.  [*Id.*]  While SA Nevala and Liverman were waiting for SA Pennisi to return, Liverman asked SA Nevala "what the arrest was about," and he responded that he did not know anything about the case, but that there was an arrest warrant for her out of Atlanta. [*Id.* at 6, 14.]  Liverman then indicated that she knew that the arrest was about a robbery.  [*Id.* at 6-7, 14.]  Liverman did not make any other statements to SA Nevala while they waited for SA Pennisi to return.  [*Id.* at 14.]

Liverman, SA Nevala, and SA Pennisi then drove from Southfield to Detroit—a thirty- to forty-minute drive.  [Doc. 336 at 5, 7.]  While it is undisputed that Liverman continued to talk during the drive, the parties have offered conflicting testimony concerning SA Nevala's interactions with her.  [*Id.* at 15-16, 23, 29-30.]  According to SA Nevala, he did not ask her any questions during the drive, and the conversation was "pretty one-sided . . . with her talking pretty much the whole way."  [*Id.* at 15.]  SA Nevala testified that he told her that he did not know anything about the case and that the case agents in Atlanta would probably be willing to talk to her once she got there.  [*Id.* at 16.]

3

By contrast, Liverman testified that during the drive, SA Nevala asked her two to four times if she knew "what this is about." [Doc. 336 at 23-24.] She also testified that she was in "shock" following the arrest, and that it was not until she was in the car with SA Nevala and SA Pennisi that she realized that the arrest related to a robbery in Atlanta. [*Id.* at 24-25, 29-30.] According to Liverman, SA Nevala's questions prompted her to recall that the arrest was in connection with a robbery in Atlanta. [*Id.* at 29-30.]

During the drive she also called her father using a cell phone that belonged to one of the agents. [Doc. 336 at 16-17.] During the call, SA Nevala overheard Liverman tell her father that she had been arrested for a robbery in Atlanta, but that she was going to court and would "straighten things out or clear things up." [*Id.* at 7-8.]

## II.   DISCUSSION

### A.   The Arrest Warrant Gave the Arresting Officers Probable Cause to Arrest Liverman.

Liverman first argues that her statements should be suppressed as the fruit of a poisonous tree because her arrest was unlawful. [Doc. 300 at 4; Doc. 340 at 2-3.] Specifically, Liverman contends that the Southfield police lacked probable

4

cause to effect the traffic stop, and points out that the government did not present any evidence at the hearing regarding the basis for the stop.  [Doc. 340 at 2-3.]

At time of Liverman's arrest, however, there was an outstanding federal arrest warrant, and police were therefore authorized to arrest her, regardless of whether probable cause existed to stop her for a traffic violation.  *See Utah v. Strieff*, __ U.S. __, 136 S. Ct. 2056, 2063 (2016) (concluding that an officer's discovery of outstanding arrest warrant rendered otherwise unconstitutional stop lawful).  Although Liverman asserts in passing that the arresting officer was not aware of the warrant before pulling her over [Doc. 340 at 3], the record indicates otherwise, as it appears that the FBI advised Southfield police of the warrant and instructed the police to apprehend her on July 29 [*id.* at 11].  In any event, even if the arresting officer was not personally aware of the warrant at the time of the traffic stop, it is undisputed that the officer became aware of it during the stop, as Liverman admitted that the arresting officer told her that there was a warrant out for her arrest.  [*See* Doc. 336 at 26.]  These facts are analogous to those in *Strieff*, where the Supreme Court held that a valid arrest warrant precludes the suppression of evidence seized during an arrest, even if the arresting officers lacked probable cause or knowledge of the warrant before the arrest.  *Strieff*, 136 S. Ct. at 2063.

Accordingly, Liverman's challenge to the constitutionality of the arrest is without merit.

### B.      Liverman Was Not Under Interrogation

Liverman next argues that the statements should be suppressed because she made the statements while in custody, in response to interrogation, and without receiving *Miranda* warnings.  [Doc. 300 at 1-3.]

A person who is arrested and detained must be given full *Miranda* warnings before any statements made in response to interrogation by a law enforcement officer may be used against her in court.  *Miranda v. Arizona*, 384 U.S. 436 (1966). *Miranda* applies only to statements given in response to interrogation—*i.e.*, express questioning or its functional equivalent.  *United States v. Roberts*, 888 F. Supp. 2d 1316, 1334 (N.D. Ga. 2012) (citing *Rhode Island v. Innis*, 446 U.S. 291 (1980)). The "functional equivalent" of express questioning occurs when officers use "any words or actions (other than those normally attendant to arrest and custody) that the police should know are reasonably likely to elicit an incriminating response from the suspect."  *Innis*, 446 U.S. at 301.  "The focus is primarily on the perceptions of the suspect, rather than the intent of the police."  *United States v. Durrah*, 384 F. App'x 970, 972 (11th Cir. 2010) (citing *Innis*).   Volunteered

statements are, by contrast admissible if not made in response to government questioning.  *Cannady v. Dugger*, 931 F.2d 752, 754 (11th Cir. 1991).

The government does not appear to dispute that at the time that she made the statements at issue in this motion Liverman was in custody and had not received her *Miranda* warnings.  The government instead argues that Liverman was not subject to interrogation, either when she was outside the police station or while she was transported to the courthouse in Detroit, and that she made the statements voluntarily and spontaneously.  [Doc. 339 at 5.]  The government further argues that even if SA Nevala posed questions to Liverman, they were not an interrogation because they were not designed to deliberately elicit incriminating responses.  [*Id.* at 7.]  Additionally, with respect to the conversation between Liverman and her father, the government argues that her statements are not subject to suppression because the agents did not encourage her to speak to her father and the statements were not made in response to questioning by the agents.  [*Id.* at 8.]

Liverman argues that SA Nevala's testimony about his interactions with her are not credible.  [Doc. 340 at 4-5.]  She points out that SA Nevala took no contemporaneous notes to memorialize the events; that he omitted from his FBI Form 302 report the admissions that Liverman purportedly made outside the police station; and that it is illogical for someone to volunteer twice, "I know what this is

7

about" unless she was being asked questions designed to elicit such a response. [Doc. 340 at 4-5.]  Liverman further argues that her account of the facts is more credible and that her testimony at the evidentiary hearing appeared truthful.  [*Id.* at 5-6.]

The analysis of Liverman's statements depends on the context in which she made them, and here, there are three separate circumstances in which she made statements:  (1) statements made outside the police station to SA Nevala while waiting for SA Pennisi to pull the car around; (2) statements made to the agents while being transported to Detroit; and (3) statements made on the telephone call to her father that the agents overhead.  The last category—statements to her father—are not suppressible because there is no evidence that those statements were elicited through the agents' questioning or the functional equivalent of questioning.  There is no evidence that either agent encouraged her to speak to her father or prompted her to make any specific statement to him.  Accordingly, I readily conclude that the statements that agents overheard her make to her father are not suppressible.

With respect to the first two categories, I also conclude that the statements are not suppressible because I find the SA Nevala's account of his interactions with Liverman outside the station and during the drive to Detroit credible, and I am

8

persuaded that the statements were not made in response to express questioning or its functional equivalent.  By the same token, I find that Liverman's account of her interactions with SAs Nevala and Pennisi to be less than fully credible.  I do not doubt that Liverman testified to her best recollection regarding the events following her arrest, but she also readily conceded that she was confused and in a state of shock following her arrest.  [*See* Doc. 336 at 24 (During the car ride, "I'm blacked out in a state of shock . . . just shocked."), 25 (During the traffic stop, "I was in a state of shock."), 26 (Upon being informed of the warrant, "My mind was completely removed from this entire situation. . . . I just was shocked all the way around like I didn't even know . . . what literally was taking place."), 27 ("I was shocked.  I was confused."), 29 (During the car ride, "I'm still in a state of shock.").]  Given the record before me, I find it more believable that Liverman asked SA Nevala what the arrest related to, realized that it related to an alleged robbery in Atlanta, and continued to talk because she felt that she could explain it away.  This conclusion is bolstered by the statements she made to her father over the phone to the effect that she had been arrested for a robbery in Atlanta in which she was an unwilling participant, but that she was going to "straighten things out or clear things up."  [*Id.* at 8.]

I also find Liverman's arguments for discounting SA Nevala's testimony unconvincing.  The fact that he did not take contemporaneous notes while standing alone on a curb with a suspect or while traveling in the car does not tend to undermine his credibility, as I am not persuaded that he should have been expected to take notes at those times.  Likewise, the fact that he omitted any mention of statements she made outside the police station does not undermine his credibility because his testimony at the hearing only supplements his report with additional information.  Liverman does not point to any testimony that contradicted his Form 302 report.  Finally, Liverman's contention—that it is illogical to think that without questioning, a person would twice volunteer "I know what this is about"—is not persuasive.  As explained above, it is more likely that Liverman repeatedly made such statements because she believed that she would be able to clear things up, just as she told her father on the telephone.

In sum, the evidence establishes that the statements Liverman made in the presence of government agents were not made in response to questioning or the functional equivalent of questioning.  As a result, there is no basis to suppress the statements.

10

### III.   CONCLUSION

For reasons discussed above, I **RECOMMEND** that Liverman's Motion to Suppress Statements [Doc. 300] be **DENIED**.

This Report and Recommendation resolves all matters pending before me relating to Liverman.  I have not been advised of any impediments to the scheduling of a trial as to Liverman.  Accordingly, this matter as to Liverman is **CERTIFIED READY FOR TRIAL**.[1]

IT IS SO RECOMMENDED and CERTIFIED this 23rd day of October, 2017.

_____
JOHN K. LARKINS III
United States Magistrate Judge

---

[1] This matters as to Liverman's codefendants have all previously been certified ready for trial.

11