IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF GEORGIA
ATLANTA DIVISION

| | | |
|---|---|---|
| UNITED STATES OF AMERICA, | : | |
| | : | |
| v. | : | CRIMINAL INDICTMENT |
| | : | NO. 1:15-CR-284-AT-JKL-5 |
| DAYNA JOY LIVERMAN | : | |
| Defendant. | : | |
| | : | |

# **ORDER**

Magistrate Judge John Larkins' Final Report and Recommendation ("R&R")[Doc. 345] is currently before the Court. The R&R recommends the denial of Defendant's Motion to Suppress Statements [Doc. 300]. The Defendant has filed objections to the Magistrate Judge's R&R that challenge the Magistrate Judge's mixed factual and legal findings that 1) there was a lawful stop of Ms. Liverman and 2) that Ms. Liverman's statements were not given in response to interrogation [Doc. 349].

A district judge has broad discretion to accept, reject, or modify a magistrate judge's proposed findings and recommendations. *United States v. Raddatz*, 447 U.S. 667, 680 (1980). Pursuant to 28 U.S.C. § 636(b)(1), the Court reviews any portion of the R&R that is the subject of a proper objection on a de novo basis and any non-objected portion on a "clearly erroneous" standard. Accordingly, the Court has reviewed the Defendant's motion on a de novo basis as

Defendant's objections go to the essence of the Magistrate Judge's evidentiary and legal analysis.

## A. The traffic stop

Defendant was arrested on July 29, 2016 by the Southfield Police Department in Southfield, Michigan after a traffic stop. (Doc. 336, Ev. Hearing at 4-5.) The Southfield police allegedly conducted this traffic stop pursuant to an outstanding federal arrest warrant out of Atlanta, which local FBI had informed them of prior to the stop. (*Id.* at 11, 19.) Defendant argues that the government has failed to "establish that the initial stop of the vehicle and arrest of Ms. Liverman were lawful." (Doc. 349) (citing *United States v. Harris*, 928 F.2d 1113, 1116 (11th Cir. 1991), "in order for the initial stop to be constitutionally firm, there must have been at least reasonable suspicion of criminal conduct.") Defendant argues that there is no evidence that the stopping officer was aware of the Atlanta warrant *before* he stopped her, and thus her statements, as "fruits" of the stop, should be excluded. *Segura v. United States*, 1468 U.S. 796, 804 (1984).

Agent Nevala's testimony at the evidentiary hearing indicates that the FBI in Detroit forwarded information of Ms. Liverman's outstanding warrant to the local Southfield Police Department prior to the stop and arrest. (Doc. 336 at 11, 19). Defendant argues that this testimony from the evidentiary hearing is not enough; that is, that the government needs to produce the arresting Southfield officer to establish that the basis for the stop was the arrest warrant out of Atlanta

or evidence amounting to reasonable suspicion or probable cause to stop. (Doc. 349 at 2-3.)

In addition to accepting Agent Nevala's testimony as credible evidence that Southfield had been made aware of the Atlanta warrant prior to the stop, the Magistrate Judge found that the statements were admissible *even if* the Southfield officer had not known of the Atlanta warrant before the stop. (Doc. 345 at 5.) He found that, because the Southfield officers were aware of the warrant at some point during the stop[1], the attenuation doctrine applies. *See Utah v. Strieff*, 136 S.Ct. 2056, 2064 (2016).[2]

The attenuation doctrine discussed in *Strieff* treats otherwise inadmissible evidence as admissible when the connection between the unconstitutional police conduct and the evidence is remote or has been interrupted by some intervening circumstance. *Id.* at 2061. The Supreme Court discusses three factors that guide an attenuation doctrine analysis: 1) the temporal proximity between unconstitutional conduct and discovery of evidence; 2) the presence of intervening circumstances; and 3) the purpose and flagrancy of official misconduct. *Id.* at 2062 (citing *Brown v. Illinois*, 422 U.S. 590 (1975)). In *Strieff*, the defendant was stopped after leaving a suspected drug house, and then arrested after the officer learned of an outstanding traffic warrant. *Strieff*, 136 S.

---

[1] During the traffic stop, Southfield police informed Ms. Liverman that they had a warrant for her arrest out of Atlanta. (Doc. 336 at 26.)

[2] The Magistrate Judge notes in the R&R that *Strieff* stands for the proposition that "an officer's discovery of outstanding arrest warrant rendered otherwise unconstitutional stop lawful." However, *Strieff* does not allow for the transformation of an unlawful stop into a lawful one; rather it allows the admission of evidence obtained illegally despite its unlawful acquisition.

3

Ct. at 2060. The officer then searched Strieff incident to the arrest, and found drugs. *Id.* In analyzing the situation under the factors established in *Brown*, the Supreme Court found that, even though the temporal proximity factor weighed in favor of suppression, the intervening circumstance of the valid warrant and the lack of flagrant misconduct outweighed temporal concerns. *Id.* at 2057.

Defendant Liverman seeks to distinguish the facts of her case based on an analysis of the third factor, arguing that the government has failed to show that the Southfield officers' stop was not the result of purposeful or flagrant misconduct. (Doc. 349 at 3-4.)

Here, there is nothing in the record to suggest that the Southfield officers' behavior constituted misconduct, let alone flagrant misconduct. "For a violation to be flagrant, more severe police misconduct is required than the mere absence of proper cause for the seizure." *Id.* at 2064 (citing *Kaupp v. Texas*, 538 U.S. 626, 628 (2003)).³ In addition, the first two factors of the attenuation analysis, the temporal proximity and the intervening circumstances, weigh in favor of admissibility. Ms. Liverman's statements were given at least an hour, very possibly more, after the stop⁴. (Doc. 336 at 16.) The warrant "discovery," the arrest, the temporary detention at Southfield police department, and the transfer

---

³ In evaluating the officer's conduct, the dissent in *Streiff* acknowledged differences between foot stops and traffic stops, stating that "we allow such [warrant] checks during legal traffic stops because the legitimacy of a person's driver's license has a 'close connection to roadway safety.'" *Id.* at 2067 (citing *Rodriguez v. United States*, 135 S.Ct. 1609, 1616 (2015)).

⁴ Defendant was pulled over around 9:30 a.m. (Doc. 336 at 16.) She was then arrested and taken to the Southfield Civic Center. (Doc. 336 at 28.) Agents Nevala and Pennisi drove 30-40 minutes from Detroit to Southfield after being informed of the arrest. (Doc. 336 at 16.) The Agents then had to wait at least 5-10 more minutes after arriving at Southfield before custody of Ms. Liverman was transferred. (Doc. 336 at 18.)

of custody constitute sufficient intervening circumstances under *Strieff*. (Doc. 336 at 16, 18, 28.)

The record before the Court suggests that the Southfield officers arrested Ms. Liverman with knowledge of the Atlanta warrant. (Doc. 336 at 11, 19.) Thus, the Court agrees with the interpretation and analysis of the Magistrate Judge in finding that the arrest was conducted pursuant to the Atlanta warrant; and *arguendo*, if not, the evidence is still admissible under the "attenuation doctrine" detailed in *Strieff*.

### B. Statements made to, and in front of, Agents Nevala and Pennisi

On the afternoon of July 29, 2016, FBI Agents Zane Nevala and Chris Pennisi transported Ms. Liverman from the Southfield police station to the Federal Courthouse in Detroit. (Doc. 336 at 3-5.) At various points before and during this transportation, Defendant made incriminating statements to the agents. (*Id.* at 6, 14.) Defendant also made statements in a phone call to her father while in en route to the Federal Courthouse, using a cell phone belonging to one of the agents. (Doc. 336 at 16-17.) These statements to her father were overheard by Agent Nevala. (*Id.*) Ms. Liverman argues that all statements should be suppressed because she was in custody, was subject to interrogation, and had not been afforded Miranda warnings. (Doc 300 at 2, citing *Endress v. Drugger*, 880 F.2d 1244, 1248 (11th Cir. 1988), "It is well-settled that Miranda warnings are required before the government may offer a statement into evidence that was elicited through interrogation from someone in custody.")

The government does not seem to dispute that Ms. Liverman was in custody or that she had not been afforded her Miranda warnings. The dispute concerns whether or not Ms. Liverman's statements were given in response to an "interrogation" by Agent Nevala.

The Supreme Court has defined "interrogation" as both express questioning and "any words or actions on the part of the police, other than those normally attendant upon arrest and custody, that the police should know are reasonably likely to elicit an incriminating response from the suspect." *Rhode Island v. Innis*, 446 U.S. 291, 292 (1980). The latter portion of this definition should focus on the perceptions of the suspect rather than the intent of the police. *Id.* Voluntary statements, however, are admissible if not made in response to interrogation. *Cannady v. Dugger*, 931 F.2d 752, 754 (11th Cir. 1991).

Here, there is a factual dispute regarding the nature of the conversations between Defendant and Agent Nevala both while waiting for Agent Pennisi to bring the car and during the drive to the Courthouse. Ms. Liverman asserts that Agent Nevala first asked her "if she knew what this [arrest] was about?" while waiting for the car, and then continued to ask "You don't know what this is about?" several times[5] after they were in the car (Doc. 336 at 23, 24.) Defendant

---

[5] It is unclear how many times Agent Nevala allegedly questioned Defendant. Liverman testified that he asked "four to five times" but also offered that he asked "anywhere from two to four times" and that "he asked me two to five times." (Doc. 336 at 23-24, 27.)

claims that these inquiries deliberately elicited an incriminating response." (Doc. 349 at 6.)[6]

Agent Nevala, on the other hand, claims he never asked Ms. Liverman any questions, and that any statements were given voluntarily and spontaneously. (Doc. 336 at 6, 15-16.) Agent Nevala testified that he told Ms. Liverman that he did not know anything about her case but that agents in Atlanta would probably be willing to talk to her. (Doc. 336 at 16.) The government further argues that even if Agent Nevala had asked the alleged questions of Ms. Liverman, they were not designed to deliberately elicit incriminating responses and were "simply part of ordinary police procedure." (Doc. 339 at 6, citing *Pennslyvania v. Muniza*, 496 U.S. 582, 603 (1990).) There does not seem to be a factual dispute about the statements made in Defendant's phone call to her father, overheard by Agent Nevala.

The Magistrate Judge first found that Defendant's statements to her father on the phone were not suppressible because there was no evidence they were elicited through questioning or the functional equivalent of questioning. (Doc. 345 at 8.) The Court fully agrees with that analysis. The Magistrate Judge further concluded that the additional statements were not suppressible because Agent Nevala was credible in his account in which he stated that he had not asked Defendant any questions. Thus, the statements were not made in response to

---

[6] Defendant cites *Brewer v. Williams* in support, yet that case involved a detective making a lengthy "Christian burial speech" intended to exploit Williams' faith and coerce him into offering incriminating information. 430 U.S. 387 (1977). There is no comparable tactic alleged in this case.

express questioning or its functional equivalent. (Doc. 345 at 8-9.) In addition, the Magistrate Judge found Ms. Liverman's account less credible because of her self-admitted "state of shock" during the time the statements were given. (*Id.* at 9.) Liverman's phone call to her father, in which she stated that she was going to "straighten things out or clear things up," further supported Agent Nevala's contention that she was providing unsolicited statements. (*Id.*)

In review, the Court finds that the Magistrate Judge carefully considered the issues of credibility involved in determining that Ms. Liverman was not subject to interrogation.[7] Having reviewed the Magistrate Judge's reasoning, the Court agrees with his recommendation to deny Defendant's Motion to Suppress. *U.S. v. Cofield*, 272 F.3d 1303, 1306 (11th Cir. 2001) (finding that district judge is not required to rehear witness testimony when accepting magistrate's credibility findings but that district judge generally cannot reject a magistrate judge's credibility determination without rehearing the disputed testimony) (citing *Raddatz*, 447 U.S. at 681 n. 7).

That said, the Court is not convinced that *had* Agent Nevala repeatedly asked Liverman if she knew "what the warrant was about," that the statements would still be admissible. Contrary to what the government argues, such questions, asked repeatedly, could be intended to elicit an incriminating response. *Innis*, 446 U.S. at 292. *See also Muniza*, 496 U.S. at 583 (Responses to

---

[7] Defendant's argument with respect to Agent Nevala's lack of a timely report memorializing the events of July 29, 2016 are noted. Though more thorough reporting is preferred, the delay here does not seriously dilute Agent Nevala's credibility.

questions that, if asked of a sworn suspect during a criminal trial, could place suspect in the "cruel trilemma" of self-accusation, perjury, or contempt are testimonial, whenever a suspect is asked for a response requiring him to communicate an express or implied assertion of fact or belief).

As the Court's conclusion hinges, in part, on the credibility of the testimony of the individuals involved, the Defendant may revisit this issue at any time through the end of trial. Accordingly, the Court **ADOPTS** the Magistrate Judge's R&R [Doc. 345], and **DENIES** Defendant's Motion to Suppress Statements [Doc. 300], subject to the qualifications noted herein.

**IT IS SO ORDERED** this 8th day of June, 2018.

**Amy Totenberg**
**United States District Judge**